ATLANTA, JANUARY TERM, 1877. 227

Atkinson *et al. vs.* The Central Georgia Agricultural and Manufacturing Company.

MARY ANN ATKINSON *et al.*, plaintiffs in error, *vs.* THE CENTRAL GEORGIA AGRICULTURAL AND MANUFACTURING COMPANY, defendant in error.

1. The Confederate States, in the year 1862, if not a *de jure* was a *de facto* government, dominant in the state of Georgia, to which any citizen of the state could sell lands and pass the title whilst it was so dominant.
2. When Georgia was overpowered by the federal forces in 1865, and such lands so owned by the Confederate government fell into the hands of the United States by conquest, the title thereto, by such conquest, passed into the government of the United States.
3. Whilst it is true that before our Code, the law was that an executor could not delegate to an agent the trust confided to him by the testator, to sell the lands of his estate, yet when the executor authorized the agent by power of attorney to make the trade, and prescribed therein the minimum price, and the agent made the deed for the executor, and the executor afterward received the purchase money, these facts vested a perfect equity in the purchaser, and neither the executor, nor the legatees for whom the executor was empowered to act, can recover the lands so sold and paid for, particularly after years of silence and acquiescence.
4. When the plaintiff's own proof showed that the title, though once in himself, had passed out of him, a non-suit was right.

Ejectment. Confederate States. Title. Conquest. Administrators and Executors. Principal and Agent. Before Judge HILL. Bibb Superior Court. April Term, 1876.

Reported in the opinion.

JOHN RUTHERFORD; R. H. CLARK, for plaintiffs in error.

LANIER & ANDERSON, HILL & HARRIS; A. O. BACON, for defendant.

JACKSON, Judge.

The legatees of ex-Governor McDonald sued the Central Georgia Agricultural and Manufacturing Company for a parcel of land near Macon, in the county of Bibb. The will

of the deceased authorized the executors to sell the land; in October, 1862, they made a power of attorney to I. C. Plant to sell for them, stipulating at what price he should sell; on the second of December, Plant sold to the Confederate government pursuant to this power; the Confederate government held the property until 1865, when it fell, by conquest, into the hands of the United States; and then passed by, perhaps, an illegal marshal's sale into the possession of defendant.

The plaintiffs themselves showed the title in McDonald at his death; his will, giving the power to his executors to sell, and their power to Plant, and his deed in their names to the Confederate government, and then its possession, by conquest, by the United States, and the illegal marshal's sale. On this proof the court non-suited the plaintiffs, they excepted, and the single question is: Was the non-suit right?

It is clear that if the title, though once in McDonald, passed out of his estate, and if the plaintiffs' proof showed this, that they could not recover, and that the non-suit was right.

1. The first question made by plaintiffs in error is: Did title pass to the Confederate government? They say that it did not, because it was an illegal, treasonable government, organized against the United States, and nobody could convey to it title to lands. Whether a legal government or not, we hold that it was a *de facto* government, ruling in Georgia by the assent of all the state authorities at that time, and by the power of arms, and as such everybody in the state was then subject to it. It could take what it pleased, being limited in the exercise of its powers only by the law of its being—its own constitution. That required it to pay for what it took; by paying, it could own for its public purposes whatever it chose in Georgia. It would be very strange if thus dominant, and having the power to coerce a sale, it could not buy from those willing to sell, and own and possess until its *vis major* was overcome by a force antagonistic and superior to its own. It is immaterial for what purpose it was bought, though the record does not disclose the pur-

pose in this case; it was, perhaps, for a laboratory for the Confederates, then at war with the United States. If that were the purpose, it was a patriotic purpose, viewed from the standpoint whence all good people in Georgia then looked at the facts—patriotic on the part of the sellers, as well as of their government, organized and put in motion by them in common with the other people of the State. The Confederate government was a *de facto* government, allegiance to it was sworn by all Georgians who held any office at all; all citizens had to pay taxes to support it, and, if not over age, were conscribed to fight for it.

2. Nor is the gist of these views—the practical result deducible from them—in conflict with the judgments of the supreme court of the United States. That court reaches the same conclusion — in a different way, perhaps more guarded, not quite so direct and plain, it may be—but yet it reaches the same conclusion, and enforces the same doctrine. In respect to this identical property, the chief justice of the United States, delivering the judgment of the full bench, says: "In war the public property of an enemy, captured on land, becomes, for the time being, at least, the property of the conqueror. No judicial proceeding is necessary to pass the title. Whose "*public property?*" Why, that of the Confederate States, of course. "To pass what title?" The title of the Confederate States, of course. Therefore the Confederate States could hold, and did hold, "public property," and could have, and did have, a *title* to it that might *pass* out of it, according to the supreme court of the United States. The chief justice goes on to say that this principle was recognized in 16 Wallace, 434, and adds: "At the close of the war there was no treaty. When the insurrection was put down, the government of the insurgents was broken up, and there was no power to treat with. Hence, the title to all captured property of the Confederate government then became absolute in the United States"—20 Wallace 475. See, also, Whitfield *vs.* United States, Law and Eq. Reporter, vol. 2, p. 287. This decision recognizes the title to this very

land to have been in the Confederate government, and to have passed out of it, by conquest, into the United States.   Of course, outside of the might of the conqueror making his behests right, that government, the United States government, by the voluntary act of Georgia in forming the constitution under which this court sits, became the lawful successor to the government of the Confederate States, and all the property which citizens of the state had sold to the original purchaser passed to the successor.  Thus the plaintiffs themselves showed title out of themselves, unless the agent of these executors of McDonald had no right or power to make the sale to the Confederate government.   Therefore the question narrows itself to the point: did the sale by the agent, Plant, pass the title, which the executors were authorized by McDonald's will to pass?

3, 4.  Unquestionably, before our Code, by the common law, the maxim "*delegatus non potest delegare*," applied to executors; and these executors, whilst empowered to sell themselves by the testator, could not delegate the power to another, though 22 *Ga.*, 600, seems to intimate, if not to hold, the contrary.   However that may be, do not the facts here show such an equity in the purchaser as to shut the mouths of these executors, or those for whom they acted, from asserting title—from denying the title which, by their power in writing, price fixed, their agent made for them? Is not such a case made that a court of equity would compel them to make title to the purchaser?   We so think. They recovered the purchase money—their own price, fixed by themselves.   They executed in writing a power to sell for that price.   They administered that purchase money under the will.   It went to the legatees, or to creditors, so that these legatees might get other property after the debts were paid, which is the same thing in effect—in substance.   They all acquiesced in the sale for years; improvements were put upon the land on the faith of the purchase, and the purchaser got a perfect equity, and a perfect equity in Georgia constitutes legal title.

For myself I think that "*ratione cessante, cessat et ipsa lex;*" and as the facts in this case show that the executors made the trade in substance, and the agent merely. signed the deed for them as a sort of ministerial act, that the reason of the prohibition of the executors to constitute an agent ceased, because they themselves made the trade and carried out the trust and confidence reposed in their judgment, and their agent was like the hand which wrote down what they dictated.   See 22 *Ga.,* 600.

The chief justice, too, inclines to the opinion, which I also hold, that their judgments sanctioned and ratified the act of their agent when they took the money, and the confidence of the testator was thus not misplaced or abused by the agent.   But we all agree that the facts here make such an equity that the mouths of the executors, and all bound by their action—all represented by them in the matter of this will—are shut from complaint, and they are all estopped from setting up a title which passed equitably from them when they authorized the sale and got the money and acquiesced so long in the trade—thereby passing, in Georgia, the legal title.

As the plaintiffs thus showed title out of themselves, by their own evidence, of course the *non-suit* was right.

Judgment affirmed.